

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

DWIGHT STONE,              )
                            )
          Plaintiff,       )
                            )
v.                      )     2:05-cv-01255-JEO
                            )
CONTINENTAL ELECTRIC    )
COMPANY, INC.; MACLEAN    )
POWER SYSTEMS; MACLEAN-FOGG  )
COMPANY; E.W. BLISS     )
COMPANY, et al.,       )
                            )
         Defendants.   )

## <u>MEMORANDUM OPINION</u>

This diversity action is before the court on defendants' Continental Electric Company, Inc., MacLean Power Systems, and MacLean-Fogg Company's (hereinafter collectively "the defendants") motion for summary judgment. (Doc. 19). The plaintiff, Dwight Stone (hereinafter "the plaintiff" or "Stone") asserts claims of negligence and wantonness against the defendants.[1] For the reasons set out herein, the court finds that the defendants' motion for summary judgment is due to be granted.

## FACTS[2]

This case arises from an accident occurring on May 5, 2003, while the plaintiff was

---

[1] The plaintiff initially asserted claims under the Alabama Extended Manufacturer's Liability Doctrine and breach of warranty in addition to his negligence and wantonness claims. However, in his response to the defendants' motion for summary judgment, the plaintiff concedes that "[b]ecause there was no sale of this press, [plaintiff] voluntarily abandons all asserted AEMLD-based claims and all breach-of-warranty claims. (Doc. 22 at p. 3). Therefore, the only remaining claims are those of negligence and wantonness.

[2] The facts set out below are gleaned from the parties' submissions and they are viewed in a light most favorable to the non-moving party. They are the "facts for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

working for his employer, Vance Tool & Die (hereinafter "Vance").  (Complaint at ¶ 7).[3]

Specifically, the plaintiff injured both of his hands while operating a "power press" machine that

was manufactured by E.W. Bliss Company in 1942.

MacLean Power is a manufacturer of parts for the electrical utility industry.  (Parker Dep.

at pp. 27-29, 41-42).  Beginning in 1995, MacLean Power began purchasing the assets of its local

competitors, Continental Electric Co., Inc., and American Metal Products.  (Parker Dep. at pp.

33-37).[4]  MacLean Power acquired the subject machine during one of these asset purchases.[5]

(Parker Dep. at pp. 48-49).  In October 2002, MacLean made the decision to outsource the actual

fabrication of "MacLean" parts to entities like Vance.[6]  (Parker Dep. at p. 59).  In late summer or

early fall of 2002, MacLean Power was liquidating some excess equipment at one of its

manufacturing facilities in order to close the facility down.[7]  (Parker Dep. at pp. 46, 51-53; Neal

Dep. at pp. 22, 25).[8]  David Neal, the Production Manager and part-owner of Vance, saw the

subject press at the American Metal Products location and asked Kevin Parker of MacLean

Power about it.  Parker told him he could take the press if he wanted it.  (Neal Dep. at pp.

108-09).  Neal did not rely on MacLean Power's expertise to select a particular press for Vance.

---

[3]A copy of the plaintiff's complaint is located at document 1, exhibit 1 in the court's record of the case.

[4]Parker's deposition is located at document 20, exhibit 4 in the court's record of the case.

[5]MacLean Power cannot trace the actual "history" of the subject press prior to October 2002.  (Parker Dep. at pp. 48-52).

[6]Vance's business is metal stamping and fabrication and MacLean Power is Vance's primary customer, accounting for approximately 70 percent of its business.  (Sherrod Dep. at pp. 29-30).  Vance makes hundreds of different parts for MacLean Power.  (Stone Dep. at p. 42).

[7] Kevin Parker was the MacLean Power employee in charge of closing down the facility, and he testified in his deposition that the liquidation of excess equipment was not really about trying to make money; rather, the intent was simply "getting rid of" or "disposing of" the excess equipment in order to "cut its losses."  (Parker Dep. at p. 55).

[8]Neal's deposition is located at document 20, exhibit 5 in the court's record of the case.

Instead, Neal understood that Vance was not being provided any warranties, guarantees, or any other promises regarding the machine when Vance got the machine from MacLean Power.  (Neal Dep. at pp. 115, 142).  According to Parker, the machines that MacLean Power was disposing of would have been in "whatever condition it was in when we had it in production if we did." (Parker Dep. at p. 166).  Parker did not impose any limitations as to how Vance could use the press and Neal did not tell Parker that he was only going to use the press for its spare parts. (Neal Dep. at p. 113).  Although the machine was transferred from MacLean Power's facility to Vance's facility, Vance never paid for the machine.  (Neal Dep. at pp. 23, 26-27, 146).

There is no evidence that MacLean Power made any modifications to the machine during its ownership of it.  (Parker Dep. at  pp. 183-84; Rennell Dep. at p. 56).[9]  Vance has equipment at its plant that belongs to MacLean Power but that Vance uses to fabricate "MacLean" parts. (Sherrod Dep. at pp. 35, 123-24; Neal Dep. at p. 140).  MacLean Power is not in the business of selling or otherwise distributing power presses.

Vance discovered some problems with the subject machine prior to the plaintiff's accident, including that the "ram" on it was cracked and misaligned.  (Neal Dep. at pp. 27-29, 66-68).  When Vance got the subject machine, the only inspection or testing that Vance performed was to turn on the machine and "cycle" it to make sure it worked.  (Neal Dep. at p. 53).  David Neal conducted this inspection, and he noted that the two-handed control buttons functioned properly and that the power switch also worked.  (Neal Dep. at p. 55).  However, Vance did not inspect the machine to ensure that it was in compliance with OSHA regulations for power presses.  (Neal Dep. at pp. 27-28).

---

[9]Rennell is the plaintiff's expert.  His deposition is located at document 20, exhibit 6 in the court's record of the case.

Much like MacLean Power, Vance uses heavy machinery to produce metal parts. (Sherrod Dep. at pp. 29-31).  The machine at issue in this case was not Vance's first experience with power presses.  Vance currently has approximately fifteen (15) power presses at its manufacturing facility.  (Neal Dep. at p. 12).  Of these, eight (8) or nine (9) are in operation, while the remainder are being kept in storage.  (Neal Dep. at pp. 12-13).  MacLean Power has two power presses in operation at its facility in Pelham, Alabama.  (Parker Dep. at pp. 94-95).

The plaintiff's "machine guarding and safety" expert (Gerald Rennell) testified that Vance should have inspected the subject machine and brought it into compliance with OSHA regulations before putting it into operation and that if Vance had done so, it would have prevented the plaintiff's accident.  (Rennell Dep. at pp. 51-52, 56-57).  Rennell also testified that, in his experience, employers in the United States tended not to have good inspection programs of their machinery even though the employer is required by OSHA to inspect the machinery and to keep written records of their inspections.  (Rennell Dep. at pp. 50-52).

When the power press was manufactured, it was designed and built to be actuated by a foot-pedal system.  (Rennell Dep. at pp. 22-25).  At some point in the machine's history (and prior to MacLean Power acquiring it), the machine was substantially modified.  (Rennell Dep. at pp. 22-25).  This modification changed the actuation of the machine from the foot-pedal system to a hand-button system.  (Rennell Dep. at pp. 22-25).  It is Rennell's opinion, based on the OSHA regulations and ANSI standards applicable to power presses, that a single-stroke mechanism and anti-repeat device should have been (but were not) incorporated into this modification.  (Rennell Dep. at pp. 24-25).  According to Rennell, the absence of said devices rendered the machine defective and unreasonably dangerous.  (Gerald Rennell's Rule 26 Report,

4

a copy of which is located at document 20, exhibit 9).

The button actuation system utilizes two buttons that must each be depressed in order for the machine to operate.  The two-button actuation system is a safety device intended to keep the machine operator's hands out of danger while the machine is in operation.  (Sherrod Dep. at p. 75; Neal Dep. at p. 52; Rennell's Dep. at pp. 58-59; Stone Dep. at pp. 56-57).[10]

Vance has had some problems with its employees bypassing the two-button system by either tying or taping down one of the buttons, thus allowing the machine to be operated with only one hand.  (Sherrod Dep. at p. 17; Neal Dep. at pp. 50-52).  This is a violation of Vance's internal safety rules, and it is also a modification of a safety device.  (Sherrod Dep. at p. 74; Neal Dep. at pp. 52, 59).  Vance tells its employees (1) not to bypass any buttons, and (2) not to use a machine if a button has been bypassed.  (Sherrod Dep. at pp. 76, 107-08; Neal Dep. at p. 59).  If a Vance supervisor were to see a button bypassed, then he should take steps to fix the problem, and, if the problem could not be fixed, then he should not use the machine.  (Neal Dep. at p. 59).

At the time of his accident, the plaintiff held the position of night-shift supervisor. (Sherrod Dep. at p. 26).  As the shift supervisor, the plaintiff was in charge of safety issues during the night shift.  (Sherrod Dep. at p. 27).  If the plaintiff saw a safety problem during the night shift, then he was supposed to determine whether he could do anything to fix it.  (Sherrod Dep. at p. 28).  If he could not fix it, then he was supposed to cease operation of the machine. (*Id*.).  More specifically, if the plaintiff saw a machine's two-button device bypassed, then he should either remove the bypass or not use the machine.  (Sherrod Dep. at p. 29; Neal Dep. at p. 59).  Use of the machine with the bypassed button violates a Vance safety rule.  (Sherrod Dep. at

---

[10]Stone's deposition is located at document 20, exhibit 10 in the court's record of the case.

p. 29).

On the night of May 5, 2003, the plaintiff was working as the night-shift supervisor at Vance.  (Stone Dep. at p. 44).  During the shift, he approached the power press to make some parts.  (Stone Dep. at p. 49).  Prior to the night of the accident, the plaintiff had never operated the subject press and he didn't "really work that area of the shop" where the press was located. (Stone Dep. at pp. 35-36).  Stone was operating the press on that occasion because another employee had not shown up for work and that particular press had to be used to make "MacLean" parts that needed to ship the next day.  (Stone Dep. at pp. 49, 54).  When he approached the machine, he noticed that one of the actuation buttons was taped down.  (Stone Dep. at pp. 53-54, 56).  The plaintiff used the machine to produce several parts and as he was reaching into the press with his hands to pull a part out of it, the "machine went off by itself."  (Stone Dep. at pp. 54, 65).  To make the parts, Stone would place a piece of metal on the die, pull his hands away, hit the activation button, form a metal part, and remove the stamped part after the press stopped. He followed this routine fifty to seventy-five times prior to his accident on other power press machines.  (Stone Dep. at p. 54).  Stone's hands were injured when the machine went off by itself and continuously cycled until the power to the press was turned off.  (Stone Dep. at pp. 68-69).  The die came down on the plaintiff's fingers, causing the amputation of both index fingers and a laceration to another finger.  (Stone Dep. at pp. 65-66).

In his deposition, the plaintiff testified that his job duties as a supervisor included "to set up the machines" and to "make sure everything was done right."  (Stone Dep. at pp. 44-45). Vance requires employees to use tools to reach into the die space when operating the power presses.  (Sherrod Dep. at pp. 81, 82; Neal Dep. at pp. 43-44).  The tools are intended as a safety

6

device, and they are located all over the "shop."  (Sherrod Dep. at pp. 81, 82).  The tools are to be

used whenever possible.  (Sherrod Dep. at p. 152).  However, the plaintiff denies that he was

ever told to use a tool, as opposed to his hands, to place an unpressed part or to remove a pressed

part from a power press or that Vance provided such tools.  (Stone Dep. at pp. 63, 65).

After learning of the plaintiff's accident, David Neal immediately questioned why the

plaintiff was not using a tool to reach into the die.  (Neal Dep. at p. 86).  While the plaintiff was

at the hospital awaiting surgery on his injured hands, Neal questioned him regarding his failure to

use a tool.  (Neal Dep. at p. 86).  According to Neal, the use of a tool would have prevented the

plaintiff's accident.  (Neal Dep. at p. 85).

The plaintiff's expert blames the plaintiff's accident on the lack of a "single-stroke

mechanism" and a "clutch spring return mechanism" (an anti-repeat device) on the power press.

(Doc. 20 at Ex. 9).  Rennell further opines that MacLean Power should not have transferred the

subject machine to Vance without the machine being in compliance with OSHA and ANSI.

(*Id.*).  According to him, MacLean Power either should have "scrapped" the machine or brought

it into OSHA and ANSI compliance before transferring it to Vance.  (Rennell Dep. at pp.

100-04).  Otherwise, Rennell opined that MacLean should have clearly designated that the press

be operated "as is."  (Rennell Dep. at pp. 101-02, 104).

When questioned further about these opinions, the plaintiff's expert admitted that there is

no OSHA regulation that would govern the transaction between MacLean Power and Vance.

Instead, Rennell testified that "OSHA only applies to the employer."  (Rennell Dep. at pp.

107-08).  According to Rennell, it is actually the employer (i.e., Vance) that has the duty to

ensure that all machines in its workplace are OSHA compliant.  (Rennell Dep. at pp. 54-55).  He

criticizes both MacLean and Vance for not getting the machine into OSHA compliance before putting it into operation.  (Rennell Dep. at p. 112).

**SUMMARY JUDGMENT STANDARD**

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof.  *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b).  Once the moving party has met her burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324.  The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may

8

not merely rest on the pleadings.  (*Id.*).

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

## DISCUSSION

### 1.        Negligence and Wantonness Claims

MacLean Power first asserts that summary judgment is due to be granted because the plaintiff has failed to establish the elements necessary to state a claim for negligence and wantonness.  (Doc. 20 at pp. 24-29).  Specifically, the defendants assert that the plaintiff must prove that they owed him a duty, that they breached that duty, and that the breach was the actual and proximate cause of his injuries to establish a claim for negligence and/or wantonness.  *Albert v. Hsu*, 602 So. 2d 895, 897 (Ala. 1992); *Morton v. Jackson Hospital & Clinic, Inc.*, 548 So. 2d 1015, 1018 (Ala. 1989); *see also Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994)(affirming summary judgment and stating that "proximate cause is an essential element of both negligence claims and wantonness claims.").

### a.        Duty

In support of their argument that they owed the plaintiff no legal duty with regard to the subject press, the MacLean defendants cite *McGraw v. Furon Co.*, 812 So. 2d 273 (Ala. 2001).

9

In the *McGraw* case, the machine at issue was purchased and used by a business (Reeves) that was later merged with Furon.  Furon moved the machine to its Tulsa plant and placed it in an outdoor scrapyard with other discarded equipment.  A Furon representative told a competitor (Wheeler) that  anyone who wanted to haul the discarded equipment away could have it. Wheeler mentioned the machine at issue to a used rubber equipment broker in Ohio (Dyer), who wanted the machine.  Wheeler had the machine loaded on a truck and sent to Dyer in Ohio.  Dyer received the machine, made no repairs to it, and shipped it to Diamond, McGraw's employer, who began to use the machine without making any changes to it.  *McGraw*, 812 So. 2d at 275.

After McGraw was injured by the machine, he sued Furon (along with the manufacturer of the machine and several other defendants) alleging violations of the AEMLD;[11] negligent failure to provide adequate safety features for the machine; and negligent failure to warn foreseeable users of the dangerous nature of the machine.  *McGraw*, 812 So. 2d at 275.

In its analysis of the plaintiff's failure to provide adequate safety features claim, the court reasoned that "[w]hile Reeves voluntarily assumed a contractual duty to provide adequate safety features for the machine, that duty was limited to the machine's use in its system."  *McGraw*, 812 So. 2d at 276.  The court found that Furon had no contractual relationship with the plaintiff's employer and that the only duty Furon assumed was to "ensure that the machine was installed safely in its system," and that Furon "did not assume a duty to ensure that it was installed safely in the system of another company with which it had no contact and of which it had no

---

[11]The court found that Furon was, at most, an "occasional seller" of used rubber machines, and therefore dismissed the AEMLD claims.  *McGraw*, 812 So. 2d at 275-76.

knowledge." *McGraw*, 812 So. 2d at 276.[12]

The plaintiff asserts, however, that the *McGraw* case is distinguishable from the instant

case because:

> Furon had no relationship with McGraw's employer and, therefore, no knowledge
> as to how McGraw's employer might use the batch-off machine.  Furon viewed
> the batch-off machine as utter scrap.  The machine passed through two third
> parties before it reached McGraw's employer.  Under those particular facts, it was
> easy to find that neither Reeves nor Furon owed any duty to McGraw with regard
> to the batch-off machine.
>
> In the present matter, there was a significant relationship between
> MacLean Power and Vance.  More significantly, in light of that relationship,
> MacLean Power appreciated, or should have appreciated, that Vance would use
> the subject press without performing any safety inspections.

(Doc. 22 at p. 20).  This court finds, however, that the plaintiff is reading more into the Alabama

Supreme Court's analysis than the court puts forth.  The *McGraw* court did not consider what

degree of relationship would confer a duty upon a party getting rid of a piece of machinery to

ensure that the machine was in compliance with safety regulations except to say that the duty did

not exist in that case.  Likewise, the *McGraw* court made no mention of whether the machine

passed directly from Reeves to the plaintiff or through two third parties as the plaintiff points out.

Although the facts reveal that the machine was loaded up by one party to be sent to another party

who ultimately sold the machine to the plaintiff's employer, the court does not place any

emphasis on those circumstances in its written analysis.  Most importantly, the *McGraw* court

noted that the only duty Furon assumed was the duty to ensure that the machine was installed

safely in *its* system.  Although the *McGraw* court adds that Furon "did not assume a duty to

---

[12]The court found the plaintiff's failure to warn claim to be without merit as there was no evidence that anyone had
ever been injured on the machine while it was used at the Reeves plant and a duty to warn "requires a finding that Furon knew, or
should have known, about the dangerous nature of the machine."  *McGraw*, 812 So. 2d at 276-77.

ensure that it was installed safely in the system of another company with which it had no contact and of which it had no knowledge," the court does not go so far as to say that Furon would have owed a duty to McGraw if it had contact with or knowledge of McGraw's employer.

This court agrees with the defendant that no evidence exists that MacLean assumed any duty to ensure that the press was safely installed in Vance's facility.  To the contrary, David Neal offered ample testimony to the fact that he assumed all responsibility for the machine on Vance's behalf.  Specifically, Neal testified to the following:

> Q.    Did you call up MacLean and complain about having a crack in [the press]?
>
> A.    No.  It was an old press.
>
> Q.    You didn't call . . . ?
>
> A.    No, sir.
>
> Q.    You just sort of took it as it was?
>
> A.    It was within what I expected to get.  I mean, it was - -

(Neal Dep. at p. 29).

> Q.    Did MacLean make any promises to you about the condition of the machine?
>
> A.    No, sir.
>
>    . . .
>
> Q.    Did you assume that once you took that machine, that the machine was Vance's responsibility?
>
>    . . .
>
> A.    Yeah.  I mean, I assumed it was my machine.

(Neal Dep. at p. 56).  Absent evidence to the contrary, the court cannot find under the facts of the

12

instant case that MacLean owed a duty to the plaintiff.

The plaintiff attempts to establish a duty owed to him by MacLean based upon a bailment theory. (Doc. 22 at p. 21). While the court is not convinced that a bailment arrangement occurred here as there is no evidence that MacLean supplied the press to Vance so that Vance could make MacLean parts as the plaintiff suggests,[13] even if a bailment did exist, the court would not find that such a bailment created any duty owed to the plaintiff. In support of his bailment theory, the plaintiff offers *Rose v. Miller & Company, Inc.*, 432 So. 2d 1237 (Ala. 1983).

In *Rose*, the plaintiff's husband was a welder for Dallas Welding and had been for seventeen years. At the time of his accident, Rose was working on replacing the shaft of a piston that Miller's company brought to Dallas Welding for repair. After attempting to free the shaft out of the piston for several hours unsuccessfully, Rose suggested using heat to dislodge the frozen part. The heat caused an explosion and Rose was killed.

After the accident, Rose's employer discovered that the piston had a cavity in it that he and Rose had not discovered at the time they applied heat to it. Rose's wife sued Miller for wrongful death asserting that "Miller negligently and wantonly maintained and caused the piston which exploded to be delivered to Rose's place of employment; that it was unreasonably dangerous and defective and that it was not reasonably safe for the intended use as impliedly warranted by Miller." She later amended her complaint to add that "Miller gave no warning or instructions to Rose when the piston was brought in for repairs." *Rose*, 432 So. 2d at 1238.

---

[13]To the contrary, Vance representatives testified that the press was used to make parts for other customers and not solely for MacLean. Specifically, David Neal testified that he "had nothing [no machine] that was specific for MacLean or any other customer." (Neal Dep. at p. 104). Additionally, David Neal testified that he was sure the subject press was used to produce parts other than MacLean parts. (Neal Dep. at p. 131).

After the trial court granted a directed verdict for the defendant, the plaintiff appealed.  The

Alabama Supreme Court then considered whether sufficient evidence existed to establish that

"Miller, the bailor-contractee owed a legal duty to Rose, . . . the bailee-independent contractor."

In so considering, the court noted that:

> Miller requested Dallas Welding to repair the piston which exploded and caused
> Rose's death; that Dallas Welding had performed work for Miller numerous times
> over the years; that Miller gave no instructions to Strickland or Rose as to how the
> piston should be repaired; and that no representative of Miller was present when
> Strickland and Rose attempted such repairs.
>
> The evidence further shows that the cause of the explosion which killed
> Rose was the application of heat to the piston . . . ; that the piston contained a
> cavity in it; that the access to this cavity was three plugs which Strickland and
> Rose failed to see because they were stopped up with rust and sawdust; and
> Strickland had no standard procedure for cleaning off items brought into his
> business, but had he done so and discovered the plugs, he would have known to
> remove one of the plugs before applying heat to permit pressure to escape.  It was
> Rose who suggested the application of heat to the piston.  Prior to Miller's
> delivering the piston and shaft to Dallas Welding, it had always been in good
> working order.  There was no evidence that any agent, servant or employee of
> Miller had any knowledge of any alleged defect or dangerous condition in the
> piston, that the piston contained a cavity, or that the presence of plugs are
> indicative of a dangerous condition.
>
> After a thorough review of the record, it is readily apparent that Dallas
> Welding was an independent contractor.  Dallas Welding was not owned by
> Miller but was solely owned and managed by John Strickland.  There is no
> evidence in the record to suggest that Miller exercised or retained any right of
> control over the manner or prosecution of the work.  Miller's only concern was in
> the result of the work.
>
> . . .
>
> . . .
>
> . . . [T]he RESTATEMENT (SECOND) OF TORTS § 388 (1965), . . . reads
> thusly:
>
> "One who supplies directly or through a third person a chattel for

14

another to use is subject to liability to those whom the supplier
should expect to use the chattel with the consent of the other or to
be endangered by its probable use, for physical harm caused by the
use of the chattel in the manner for which and by a person for
whose use it is applied, if the supplier
(a) knows or has reason to know that the chattel is or is likely to be
dangerous for the use for which it was supplied, and
(b) has no reason to believe that those for whose use the chattel is
supplied will realize its dangerous condition, and
(c) fails to exercise reasonable care to inform them of its dangerous
condition or of the facts which make it likely to be dangerous."

Here the evidence is insufficient to find a duty owed by Miller to Rose.
Under § 388, the supplier is liable if he "knows or has reason to know that the
chattel is or is likely to be dangerous," and fails to so warn.  It is the duty of the
user to reasonably inspect the chattel, and a supplier is never held liable for a
condition "which a mere casual looking over will disclose . . . .  However, the
condition, although readily observable, may be one which only persons of special
experience would realize to be dangerous."  Comment K.

A similar rule was adopted in *Lambert v. Pittsburgh Bridge & Iron Works*,
227 Pa. Super. 50, 323 A.2d 107 (1974), in which the Pennsylvania court
concluded:

"[W]here, as in the instant case, the evidence discloses that the
bailee over a long period of business dealing is competent to
recognize certain defects or conditions of disrepair in a particular
kind of chattel, the duty is on the bailee and not the bailor, to make
reasonable inspections of the chattel to insure that its employees
will not become injured thereby in the course of the intended
bailment.

*Lambert*, 323 A.2d at 112.

The evidence in this case discloses that neither Strickland nor Rose
attempted to make a reasonable inspection of the piston or shaft.  Strickland had
done such work for approximately 20 years, while Rose had 16 years experience.
 . . .  There is no evidence to support plaintiff's contention that Miller was aware
of the cavity in the piston or that heat would be used to make the repairs.

*Rose*, 432 So. 2d at 1239-40.

Although, as stated previously, the court is not convinced that the plaintiff could establish

15

that a bailment-like arrangement existed in this case, even assuming a bailment, the court finds

the evidence insufficient to establish a duty owed the plaintiff by MacLean based on that

bailment.  The plaintiff has not presented any evidence that any of MacLean's employees had

knowledge that the subject press was dangerous or was not in compliance with safety standards.

To the contrary, no evidence exists that anyone at MacLean ever inspected the subject press.

Kevin Parker testified that, in disposing of the equipment in the facilities that MacLean took

over, he did not do any inspections of the machinery to determine maintenance needs.[14]  (Parker

Dep. at p. 123).  Furthermore, MacLean did not retain any power or control over Vance, except

to the extent that they provided Vance with specifications for the parts they were making.  The

tooling necessary to make MacLean parts could be used in a variety of presses and no evidence

exists that MacLean had any control over which press Vance's employees used to make

particular parts.  (Neal Dep. at p. 40).

What the evidence does show, however, is that Vance had experience working with

presses.[15]  David Neal began working at Vance sometime around 1997 and was in charge of

maintenance of the presses at that time.  (Neal Dep. at pp. 14-15).  In fact, Neal personally

inspected the used machines that Vance acquired during his employment there.  During his

inspections, he has made an effort to determine whether the machines are safe, although he has

---

[14]The plaintiff notes an inventory of the equipment at the American Metal Products' plant utilizing a "code" system to designate whether a particular machine was OSHA compliant.  However, the subject press was not listed on the inventory. Although it is clear that some inspection was done on at least some of the American Metal Products' equipment, there is no evidence that any such inspection was done on the subject press.

[15]Stone argues that the "sophisticated user" doctrine is not applicable to the instant case.  However, the court finds that there is no indication that Vance would need to be a "sophisticated user" to determine the defect in the machine.  Instead, the plaintiff's expert testified that "it doesn't take a rocket scientist to figure out that it was not in compliance with OSHA."  (Rennell Dep. at pp. 55-56).

16

not necessarily endeavored to be sure they are in compliance with OSHA.[16]

Based on the foregoing, the court cannot find that MacLean Power owed the plaintiff any duty with regard to the subject press.  The only duty created under the law was Vance Tool and Die's.  Therefore, the plaintiff's wantonness and negligence claims against MacLean Power are due to be dismissed.[17]

### 2.    Negligent Failure to Warn[18]

The Alabama Supreme Court has stated that:

The duty to warn end users of the dangers of products arises, in a pure negligence context, from § 388, Restatment (Second) of Torts, as adopted by this court.  *See Purvis v. PPG Industries, Inc.*, 502 So. 2d 714, 719 (Ala. 1987)(interpreting a negligent-failure-to-warn claim using § 388).

*Ex parte Chevron Chemical Co.*, 720 So. 2d 922, 924-25 (Ala. 1998).  Because the court has already found that the defendant did not owe the plaintiff any duty based upon § 388, it follows that the defendant had no duty to warn the plaintiff or Vance for the reasons already set forth in the general negligence analysis herein.  Accordingly, the plaintiff's failure to warn claim is due to be dismissed as well.

---

[16]During his inspection of the subject press, Neal noticed a crack in the ram.  (Neal Dep. at pp. 28-29).

[17]Even assuming the court had found that MacLean Power owed a duty to the defendant, the plaintiff has failed to establish that breach of that duty was the proximate cause of his injuries.  Instead, Vance's neglect in maintaining its equipment in compliance with OSHA constitutes an "intervening cause" that would break the chain of causation between MacLean's act or omission and the plaintiff's injury.  *See General Motors Corp. v. Edwards*, 482 So. 2d 1176, 1194-95 (Ala. 1985).  The plaintiff argues that Vance's neglect was foreseeable to MacLean, and thus, cannot be an intervening cause.  Specifically, the plaintiff argues that "MacLean Power knew, or should have known, that Vance might well fail to fulfill its duty to its own employees." (Doc. 22 at p. 28).  However, the plaintiff has not presented any facts or testimony that would establish such foreseeability on MacLean Power's part.

[18]Failure to warn claims may arise out of AEMLD claims or out of a pure negligence theory.  Because the plaintiff has conceded his AEMLD claims, the court need only address his failure to warn claim under a negligence theory.

## CONCLUSION

Premised on the foregoing, the defendant's motion for summary judgment (doc. 19) is due to be granted in its entirety.  An appropriate order will be entered contemporaneously herewith.

**DONE**, this the 19th day of December, 2006.

_John E. Ott_

**JOHN E. OTT**
United States Magistrate Judge

18